# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**CHRISTINA HANKINS,**

       **Plaintiff,**

      **vs.**

**COMMISSIONER OF SOCIAL SECURITY,**

      **Defendant.**

              **Civil Action 2:14-cv-68**
              **Judge George C. Smith**
              **Magistrate Judge Elizabeth P. Deavers**

## REPORT AND RECOMMENDATION

Plaintiff, Christina Hankins, brings this action under 42 U.S.C. § 405(g) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for Social Security Disability Insurance Benefits.  This matter is before the United States Magistrate Judge for a Report and Recommendation on Plaintiff's Statement of Errors (ECF No. 8), the Commissioner's Memorandum in Opposition (ECF No. 13), Plaintiff's Reply (ECF No. 16), and the administrative record (ECF No.7).  For the reasons that follow, it is **RECOMMENDED** that the Court **REVERSE** the Commissioner of Social Security's nondisability finding and **REMAND** this case to the Commissioner and the ALJ under Sentence Four of § 405(g).

## I.  BACKGROUND

Plaintiff filed her application for benefits on August 16, 2010, alleging that she has been disabled since May 15, 2008, at age 37.  (R. at 161-67.)  Plaintiff alleges disability as a result of severe panic disorder, depression/anxiety, obsessive compulsive disorder, social anxiety, and memory problems.  (R. at 105.)  Plaintiff's application was denied initially and upon reconsideration.  Plaintiff sought a *de novo* hearing before an administrative law judge.

Administrative Law Judge Timothy G. Keller (the "ALJ") held a hearing on September 13, 2012, at which Plaintiff, who was represented by counsel, appeared and testified.  (R. at 79-95.)  A vocational expert, George W. Coleman, III, M.S. (the "VE"), also appeared and testified.  (R. at 96-99.)  On September 28, 2012, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act.  (R. at 11-37.)  On November 20, 2013, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision.  (R. at 1-5.)  Plaintiff then timely commenced the instant action.

## II.    HEARING TESTIMONY

### A.    Plaintiff's Testimony

Plaintiff testified that she was last employed approximately four and one-half years prior to the hearing as a surgical nurse for oral surgeons.  (R. at 79-80.)  She also testified that she stopped working due anxiety and panic attacks.  (R. at 80.)  She explained that she was hired at Fritz Meth Clinic in September 2009, but did not end up working there because she started having panic attacks when she was supposed to go in for orientation.  (R. at 81.)

Plaintiff testified that she is currently receiving treatment from Drs. Koehler and Desai.  (R. at 81.)  Plaintiff testified that she did not recall ever telling Dr. Desai that she was feeling better, that her moods had improved, that her panic attacks have decreased, or that she has no side effects from her medication.  (R. at 83-84.)  Plaintiff testified that she has been treating with Dr. Desai for less than a year, that he "just prescribes [her] medications," does not sit and talk to her, and is usually in the room with her for "two minutes."  (R. at 82-83.)  She stated that Dr. Koehler has primarily been treating her for her conditions.  (R. at 83.)  Plaintiff reported taking seven or eight pills for her mental conditions.  (R. at 84.)  She noted the side effects from her

2

medications included daily diarrhea, nausea, and fatigue.  (R. at 85.)

Plaintiff testified that on a typical day, she wakes up around 11:00 or 11:30 a.m. and then watches television or naps.  (R. at 86.)  She stated that her daughter is at home with her during the day because she homeschools from her computer.  (R. at 85.)  Plaintiff and her husband help their daughter with her homeschooling.  (R. at 85-86.)  Plaintiff stated that she only goes outside to let her dog out and that she does not like to go outside due to the light and her fear of people passing by.  (R. at 87.)  Plaintiff reported that she has panic attacks more than once per week, lasting for minutes to hours at a time, with the following symptoms: shortness of breath, skin crawling, heart raising, nervousness, and inability to stand noise or touch.  (R. at 88-89.)  She testified that she has never checked into a hospital because of her panic attacks, but she does call Dr. Koehler.  (R. at 89.)

Plaintiff testified that she sometimes goes several days without showering.  (R. at 91.) She testified that she only goes to the grocery store once a month.  (R. at 90.)  She described an incident when she went to the grocery store and left her items at the checkout due to her anxiety. (*Id.*)  She socializes with one friend and her sister.  (R. at 91.)   She stated that she eats "all the time."  She eats whatever is around the house, including sandwiches, chips, and microwave meals.  (R. at 93.)   Plaintiff testified that she does not complete chores or cooking.  (R. at 90-91, 93.)  Plaintiff reported that her nine year old daughter takes care of herself a lot.  (R. at 85-86, 92.)  She testified that her husband takes her to her doctor's appointment.  (R. at 94.)   She testified that she has a driver's license but only drives "once in a while."  (R. at 93.)  She stated that she used to go to church and read, but no longer does either.  (R. at 95.)

Finally, Plaintiff testified that she often has thoughts about committing suicide, but has

3

never actually attempted suicide.  (R. at 92.)  She indicated that she sees Dr. Campbell for counseling.  (R. at 92.)

**B.    Vocational Expert Testimony**

The VE classified Plaintiff's past employment as a surgical nurse, at the skilled, medium exertional level; surgical nurse assistant, charge nurse at a nursing home, and medical assistant, all at the skilled, light exertional level; and home health aide, at the semi-skilled, medium exertional level.  (R. at 96-97.)

The ALJ proposed a hypothetical question regarding an individual with Plaintiff's age, education, and work experience, and the following capabilities and limitations: no exertional limitations; able to understand, remember, and carry out simple tasks and instructions; able to maintain concentration and attention for two-hour segments over an eight-hour work period; able to respond appropriately to supervisors and coworkers in a task-oriented setting, where contact with others is casual and infrequent; and able to adapt to simple changes and avoid hazards in a setting without strict production standards.  (R. at 97.)  Based on this hypothetical, the VE acknowledged that the hypothetical individual could not perform Plaintiff's past relevant work, but could perform other jobs at the light exertional level, such as a hotel/motel housekeeper, with 1,219 jobs existing in the regional economy and 221,590 jobs in the national economy; office helper, with 55 jobs existing in the regional economy and 12,380 jobs in the national economy; and mail clerk with 313 jobs in the regional economy and 24,480 jobs in the national economy. (R. at 98.)  The VE testified that his testimony does not conflict with the Dictionary of Occupational Titles ("DOT").  (R. at 99.)

When cross-examined by Plaintiff's counsel, the VE acknowledged that a person with the

limitations described in Dr. Koehler's opinion would not be able to maintain competitive

employment.  (R. at 99.)

### III.    PLAINTIFF'S BACKGROUND QUESTIONNAIRE AND FUNCTION REPORT

On September 17, 2010, Plaintiff completed a "Function Report."  (R. at 203-210.)

When asked to describe what she does from the time she wakes up until going to bed, Plaintiff

stated as follows: "Give my daughter breakfast, usually go back to sleep.  Give my daughter

school assignments and lunch[,] go back to sleep (I eat lunch)[.]  Watch TV[,] give my daughter

dinner, start her shower, watch TV[,] and go to sleep.  Sometimes on Sundays I go to Church."

(R. at 204.)  Plaintiff stated that she takes care of her daughter; she feeds her and makes sure she

does her school assignments.  *Id.*  She also stated that she sometimes provides food and water for

her animals and lets her dog out a couple of times each day.  *Id.*  Plaintiff explained that her

husband "makes sure [she's] fed animals, [and] helps with Rylee ([her] daughter)."  *Id.*  She

further stated that she hardly ever sees friends, cannot have people over, and cannot commit to

anything.  *Id.*

Regarding her personal care, Plaintiff stated that she does not care what she wears, only

bathes a couple of times per week, wears her hair in a ponytail, only shaves when she has to, and

feeds herself quick and easy meals. (R. at 205.)  She stated that her husband will ask her if she is

going to shower or change her clothes and reminds her to take her medications.  *Id.*  Plaintiff

asserted that she only prepares meals two-three times per week and that it only takes her a few

minutes to do so.  *Id.*

Plaintiff expressed that she can do laundry and dishes, but she does not do much of

anything because she does not have the drive or desire.  (R. at 206.)  She goes outside once or

twice per week and when she does so, she rides or drives in a car.  *Id.*   She only drives when she has to do so.  *Id.*  Plaintiff further stated that she will shop for groceries once every three weeks and that it takes her two-and-a-half hours.  *Id.*   She does not handle any money or pay bills because she cannot remember to pay bills on time and gets anxious trying to "figure it out."  (R. at 207.)  She listed watching television as her only hobby or interest.  *Id.*   Plaintiff stated that she goes to her sister's house every couple months, her parents' house once a month, and to Church two-three times per month when she is not feeling anxious.  *Id.*  Plaintiff stated she will not go to Church unless her husband attends because she feels safer with him.  *Id.*  Plaintiff expressed that she does not like to commit to group activities because the only people she feels comfortable around are her parents, sister, husband, and friend Kim.  *Id.*

When asked about abilities that her conditions affect, Plaintiff listed: understanding, following instructions, memory, talking, completing tasks, and concentration.  (R. at 208.)  She explained that her mind wanders and she has a hard time concentrating.  *Id.*  She also does not feel comfortable talking to people.  *Id.*  Plaintiff stated that authority figures and change in routine make her nervous.  (R. at 208-09.)  Finally, Plaintiff stated that she does not like making commitments, being in crowds, or being around people that she does not know.  (R. at 209.)  She explained that she "get[s] anxious and [has] panic attacks."  *Id.*  She also stated that she has "terrible thoughts of doom[] [and] sickness."  *Id.*

On April 2, 2012, Plaintiff completed a "Background Questionnaire."  (R. at 266-68.)  In this Questionnaire, Plaintiff asserts that she is not able to mow grass and that she rarely washes dishes, mops and vacuums, shops for groceries, or drives a car.  (R. at 267.)  She stated that she does not do much cooking and does "very little" chores at home.  *Id.*  She submits that, during a

normal day, she "eat[s], watch[es] TV, oversee[s] Daughter[']s school work, [and] sleep[s]."  (R. at 268.)  Finally, she asserts that she watches TV for entertainment/enjoyment.  *Id.*

## IV.    MEDICAL RECORDS

### A.    Matthew Koehler, M.D.

Plaintiff's treatment records indicate that she treated with her primary care physician, Dr. Koehler, from at least April 2003 through July 2012.  In April 2003, Plaintiff presented to Dr. Koehler, complaining of anxiety, shortness of breath, heart racing, and nervousness.  Dr. Koehler prescribed Paxil and Xanax.  (R. at 445-46.)  Dr. Koehler continued to treat Plaintiff through at least July 2012.  (R. at 282-323, 373-468.)  Dr. Koehler's diagnoses included an anxiety disorder, panic disorder with obsessive compulsive disorder, and social phobia.  (*Id.*)  Clinical notes established that Dr. Koehler periodically adjusted Plaintiff's medications to relieve her depression, anxiety, and panic attacks.  (R. at 282, 284, 285, 287, 289, 298, 384.)  On February 2, 2012, Dr. Koehler noted that Plaintiff did not leave the house, interact with others, and was afraid to answer the door.  (R. at 377.)  In February 2012, Dr. Koehler counseled Plaintiff to seek more aggressive treatment, but she declined.  (R. at 380.)

On March 1, 2012, Dr. Koehler reported that Plaintiff had been treating with him for nine years.  (R. at 372.)  He opined that Plaintiff suffers from generalized anxiety disorder, panic disorder, and social phobia.  He stated that Plaintiff does not leave her home except for medical appointments, to visit her sister, or when otherwise necessary.  He found that she feels panicky even going to the doctor's office.  He also explained that she is afraid to answer the door or phone because of her fear of social interaction.  Dr. Koehler further stated that Plaintiff has a phobia of medication, but despite her phobia, she has been compliant with his advice and is

tolerating therapy.  Dr. Koehler concluded that, "Nonetheless, [Plaintiff's] symptoms remain

severe and disabling. . . .  [Plaintiff] is in my opinion permanently and total[ly] disabled due to

the above conditions."  (R. at 372.)

On June 6, 2012, Dr. Koehler completed a mental impairment questionnaire, in which he

noted that Plaintiff had a fair response to her medications, but they cause her to suffer from

drowsiness, fatigue, and lethargy.  (R. at 340.)  When asked to describe the clinical findings and

results of mental status examination that demonstrate the severity of Plaintifff's impairment, Dr.

Koehler noted her "affect: anxious, shaky, tearful, and her speech was hesitant." *Id.*  He reported

that her prognosis was "fair." *Id.*  Dr. Koehler reported that Plaintiff's symptoms included:

anhedonia or pervasive loss of interest in almost all activities; decreased energy; feelings of guilt

or worthlessness; generalized persistent anxiety; mood disturbance; difficulty thinking or

concentrating; change in personality; apprehensive expectations; recurrent obsessions or

compulsions which are a source of marked distress; emotional withdraw or isolation; persistent

irrational fear of a specific object, activity, or situation which results in a compelling desire to

avoid the dreaded object, activity, or situation; easy distractibility; memory impairment; sleep

disturbance; and recurrent severe panic attacks manifested by a sudden unpredictable onset of

intense apprehension, fear, terror, and sense of impending doom occurring on the average of at

least once a week.  (R. at 341.)  Dr. Koehler opined that Plaintiff was "seriously limited, but not

precluded" from understanding and remembering very short and simple instructions, but found

that she was "unable to meet competitive standards" in all other mental abilities and aptitudes

needed to do unskilled work.  (R. at 342.)  He opined that Plaintiff is "unable to meet

competitive standards" for mental abilities and aptitudes needed to do semi-skilled and skilled

8

work.  *Id.*  Finally, he opined that Plaintiff is "seriously limited, but not precluded" from adhering to basic standards of neatness and cleanliness in a work setting, but is unable to meet competitive standards for mental abilities and aptitude needing to do particular types of jobs.  (R. at 343.)  According to Dr. Koehler, Plaintiff was extremely restricted in her of activities of daily living and in maintaining social functioning; and markedly limited in maintaining concentration, persistence, or pace.  Dr. Koehler concluded that a minimal change in environment could cause her to decompensate and that she is unable to function outside of her home due to her anxiety.  Dr. Koehler concluded that Plaintiff would be absent from work more than four days per month.  (R. at 340-44).  Finally, Dr. Koehler indicated that Plaintiff is not a malingerer.  (R. at 344.)

## B.    Sudhir Dubey, Psy.D.

On October 25, 2010, consulting psychologist, Dr. Dubey, examined Plaintiff.  (R. at 333-38).  Plaintiff reported that she was on medication for depression and anxiety, but was receiving no other psychiatric treatment.  On examination, Dr. Dubey found that Plaintiff had appropriate hygiene and grooming, normal motor activity, and that her facial expressions and behavior were alert, tense, and anxious.  (R. at 337.)  He noted that Plaintiff was cooperative with normal eye contact and speech and appropriate affect.  He further noted that her emotional reactions were tearful, anxious, and depressed.  (R. at 335.)  She reported that she is satisfied with the relationship she has with her husband and describes it as supportive.  She describes her relationship with her daughter as being "okay."  (R. at 334.)  She also reported that she has a friend that provides her with emotional support, along with her sister and husband.  *Id.*  She reported symptoms of depression for more than ten years and anxiety for more than six years.  (R. at 337.)  She also reported symptoms of panic.  She reported crying daily for the past year

9

and a half.  *Id.*  She reported feeling okay about herself, but feeling discouraged due to her life situation.  (R. at 335.)  She further reported that she sleeps excessively—a total of sixteen hours—and still wakes up feeling not well rested.  *Id.*  Dr. Dubey noted that Plaintiff was relatively inactive, cannot independently perform daily chores, bathed infrequently, drives only short distances, needs emotional support to shop, and has decreased socialization.  (R. at 337.)  Dr. Dubey noted that Plaintiff was "consistent and credible with the information she provided during the course of the evaluation."  *Id.*

Dr. Dubey concluded that Plaintiff's cognitive functioning was in the low average range.  (R. at 336.)  He diagnosed Plaintiff with major depression, recurrent with moderate severity, and a generalized anxiety disorder.  Plaintiff was assigned a Global Assessment of Functioning ("GAF") score of 60.[1]  (*Id.*)

Dr. Dubey opined that Plaintiff was not impaired in her mental ability to do the following: to understand, remember, and follow simple instructions; to maintain attention, concentration, persistence, and pace to perform simple repetitive tasks; to relate understand and follow complex instructions; and to handle her own funds.  (R. at 333-38.)  He concluded that her ability to relate to others, including fellow workers and supervisors, and her mental ability to perform complex tasks are mildly impaired.  Finally, he found that her ability to withstand stress and pressure associated with day-to-day work activity is moderately impaired.  *Id.*

---

[1]The GAF scale is used to report a clinician's judgment of an individual's overall level of functioning.  Clinicians select a specific GAF score within the ten-point range by evaluating whether the individual is functioning at the higher or lower end of the range.  *See* Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders, 4th ed., 1994, at pp. 32-34 ("DSM-IV-TR").  A GAF score of 51-60 corresponds to moderate symptoms or moderate difficulty in social, occupational, or school functioning.  DSM-IV-TR at 32.

### C.    Marion General Hospital

Plaintiff presented to the emergency room on July 16, 2011, due to a right-sided headache associated with blurry vision.  She was diagnosed with atypical migraine.  (R. at 470-76.)

### D.    Bipin Desai, M.D./ Robert Campbell, M.S.S.A., LISW-S

Dr. Desai and social worker Robert Campbell work in the same office.  On April 16, 2012, Plaintiff underwent a diagnostic assessment with Robert Campbell on referral from Dr. Koehler.  (R. at 358–63.)  His diagnosis was major depressive disorder, recurrent, moderate; panic disorder with agoraphobia; and generalized anxiety disorder.  He assigned Plaintiff a GAF score of 50.[2]  (R. at 363.)

Plaintiff was evaluated by psychiatrist, Bipin Desai, M.D. on May 8, 2012.  (R. at 349.) Plaintiff reported "vegetative" symptoms.  On mental status examination, Plaintiff was found to be friendly, minimally communicative, casually groomed, overweight, and anxious.  Dr. Desai noted that signs of moderate depression were present, that her demeanor was sad, and that she appeared listless, anergic, and downcast.  *Id.*  He found that her body posture and attitude conveyed an underlying depressed mood and that her speech and thinking appeared slowed by her depressed mood.  *Id.*  He also noted that her facial expression and general demeanor revealed a depressed mood.  He found no signs of hallucinations, delusions, bizarre behaviors, suicidal ideas, or other indicators of psychotic process existed.  He concluded that her vocabulary and fund of knowledge indicated cognitive functioning in the normal range.  *Id.*  Her insight into her illness and her social judgment was fair.  Dr. Desai diagnosed her with major depressive

---

[2]A GAF score of 50 is indicative of "serious symptoms ... or serious impairment in occupational, social, or school functioning."  DSM-IV-TR at 34.

disorder, recurrent, moderate; panic disorder with agoraphobia; and generalized anxiety disorder. (R. at 349-50.)

In June 2012, Dr. Desai noted that Plaintiff was feeling better, that her moods had improved, and that her panic attacks have decreased, but also noted that she appeared anxious. (R. at 347.)

On July 2, 2012, Mr. Campbell completed a mental impairment questionnaire.  Mr. Campbell reported that Plaintiff suffered from anhedonia, weight change, decreased energy, feelings of worthlessness, anxiety, somatization, mood disturbance, difficulty concentrating, pathological dependence, persistent disturbances of mood, apprehensive expectation, emotional withdraw or isolation, persistent irrational fear, emotional liability, easy distractibility, memory impairment, sleep disturbance, and recurrent severe panic attacks.  (R. at 353.)  He concluded that Plaintiff had a GAF score of 50.  Mr. Campbell opined that Plaintiff had marked restrictions of activities of daily living; extreme difficulties in maintaining social functioning and concentration, persistence, or pace; and would have four or more episodes of decompensation in a twelve-month period.  Mr. Campbell concluded that Plaintiff was unable to function outside of the home due to her anxiety disorder and would miss more than four days per month from work. (R. at 352-57.)  He noted that Plaintiff is not a malinger.  *Id.*

## E.     State-Agency Psychologists

On November 8, 2010, after review of Plaintiff's medical record, Karla Voyten, Ph.D., a state-agency psychologist, assessed Plaintiff's mental condition.  (R. at 106-09.)  Dr. Voyten opined that Plaintiff had mild restrictions in her activities of daily living; mild difficulties in maintaining social functioning; and mild difficulties in maintaining concentration, persistence, or

pace; with no episodes of decompensation of an extended duration.  (R. at 106.)  She further determined that the evidence did not establish the presence of the "C" criteria.  (*Id.*)  Dr. Voyten determined that Dr. Dubey's assessment that Plaintiff would have moderate limitations in stress tolerance cannot be given great weight because it is inconsistent with her own reports of functioning regarding her activities of daily living.  Dr. Voyten also noted that Plaintiff had never been psychiatrically hospitalized.  Dr. Voyten found Plaintiff's allegations were partially credible.  (R. at 107.)

Jennifer Swain, Ph.D., another state agency psychologist, reviewed the mental health records on March 17, 2011.  (R. at 115-18.)  Dr. Swain opined that Plaintiff had mild restrictions in her activities of daily living; moderate difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence, or pace; with no episodes of decompensation of an extended duration.  (R. at 115.)  In opining on Plaintiff's mental RFC, Dr. Swain found that Plaintiff was moderately limited the following areas: ability to maintain attention and concentration for extended periods; ability to work in coordination with or in proximity to others without being distracted by them; and ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  (R. at 117.)  Dr. Swain explained that Dr. Dubey opined that Plaintiff had no impairment in concentration, persistence and pace.  *Id.*  However, she concluded that because Plaintiff has had ongoing treatment for depression and panic attacks, she expects that these conditions would interfere with her ability to sustain concentration, persistence and pace.  *Id.* Additionally, Dr. Swain noted that Plaintiff reports some difficulties with concentration in daily function.  Dr. Swain opined that

13

Plaintiff retains the ability to sustain routine tasks in a setting where no strict production demands exist and where social distractions are minimal.  (R. at 117.)  Dr. Swain also determined that Plaintiff would be moderately limited in her to ability to interact appropriately with the general public and to accept instructions and respond appropriately to criticism from supervisors.  *Id.*

Dr. Swain noted that even though Dr. Dubey found she was impaired in her ability to interact socially, Plaintiff's primary care physician records show anxiety and panic symptoms which have waxed and waned in severity over time.  Dr. Swain noted that Plaintiff was tense and anxious at her consultive examination and that she reported that she feels uncomfortable in groups and with most people outside of a small group of family and friends.  Dr. Swain noted, however, that she is able to attend church, drives, goes to the grocery for two and one-half hours at a time, and denies problems getting along.  Dr. Swain concluded that Plaintiff retains the ability to interact with others for brief, superficial contacts, and found that she would likely perform best in a smaller, non-public setting.  (R. at 118.)  Dr. Swain also found that Plaintiff would be moderately limited in her to abilities to respond appropriately to changes in the work setting and in her ability to travel in unfamiliar places or use public transportation.  *Id.*  Dr. Swain opined that Plaintiff retains the ability to sustain work in a relatively static setting.  (R. at 118.)

## V.   THE ADMINISTRATIVE DECISION

On September 13, 2012, the ALJ issued his decision.  (R. at 11-37.)  At step one of the sequential evaluation process,[3] the ALJ found that Plaintiff had not engaged in substantially

---

[3] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence.  *See* 20 C.F.R. § 404.1520(a)(4).  Although a dispositive finding at

gainful activity since her alleged onset date of May 15, 2008.  (R. at 16.)  At step two, the ALJ

found that Plaintiff had the severe impairments of a depressive disorder and an anxiety disorder.

(*Id.*)  The ALJ concluded that Plaintiff's physical impairments are not severe.  (R. at 16-19.)  At

step three, he found that Plaintiff does not have an impairment or combination of impairments

that meets or medically equals one of the listed impairments described in 20 C.F.R. Part 404,

Subpart P, Appendix 1.  (*Id.*)  At step four of the sequential process, the ALJ evaluated

Plaintiff's Residual Functional Capacity ("RFC") and found as follows:

> After careful consideration of the entire record, I find that the claimant has the
> residual functional capacity to perform a full range of work at all exertional levels
> without physical limitation. Mentally, the claimant retains the capacity to
> understand, remember and carry out simple tasks and instructions and can
> maintain attention and concentration for 2-hour segments over an 8-hour work
> period. She can respond appropriately to coworkers and supervisors in a task
> oriented setting where contact with others is casual and infrequent and adapt to
> simple changes and avoid hazards in a setting without strict production standards.

(R. at 25.)  In reaching this determination, the ALJ adopted the opinions of the State agency

psychologist, Dr. Swain.  (R. at 27.)  The ALJ gave "no" weight to the opinions of Dr. Koehler,

finding that the final responsibility for determining if a claimant is "disabled" or "unable to

work" is reserved for the Commissioner, that Dr. Koehler is a primary care physician, not a

---

any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully
considered, the sequential review considers and answers five questions:

1.  Is the claimant engaged in substantial gainful activity?
2.  Does the claimant suffer from one or more severe impairments?
3.  Do the claimant's severe impairments, alone or in combination, meet or
    equal the criteria of an impairment set forth in the Commissioner's Listing of
    Impairments, 20 C.F.R. Subpart P, Appendix 1?
4.  Considering the claimant's residual functional capacity, can the claimant
    perform his or her past relevant work?
5.  Considering the claimant's age, education, past work experience, and residual functional
    capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009);
*Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

psychologist, psychiatrist, or mental health specialist, and that Dr. Koehler's opinion is inconsistent with the totality of the evidence.  (R. at 28-29.)  The ALJ also gave "no" weight to the opinion of Mr. Campbell due to the opinion being inconsistent with Plaintiff's counseling notes and with the totality of the evidence.  (R. at  29.)  The ALJ further noted that Plaintiff's testimony regarding the extent of her symptoms and limitations is not fully credible, but that her complaints have been included in the RFC to the extent that they are consistent with the evidence.  (R. at 30.)

At step five, relying on the VE's testimony, the ALJ determined that Plaintiff could not perform her past relevant work, but there were jobs that existed in significant numbers in the state and national economy that Plaintiff can perform.  (R. at 30-33.)  He therefore concluded that Plaintiff was not disabled under the Social Security Act.  (R. at 33.)

## VI.    STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. at 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. at 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").  Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial.  The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision.  *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).  Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VII.   ANALYSIS

In her Statement of Errors, Plaintiff asserts that the ALJ's treatment of the evidence in the record was inconsistent and improper.  According to Plaintiff, the ALJ's "reasoning behind some statements in his decision had no basis and created a picture of Plaintiff that was far from what was presented by medical records, testimony and the entirety of her file."  (Plaintiff's Statement of Errors 8, ECF No. 14.)  Essentially, she contends that the ALJ "cherry picked" certain evidence to support his conclusions.  Plaintiff also contends that the ALJ failed to follow the treating physician rule in failing to give appropriate consideration to the opinions of Robert Campbell, LISW-S, and Dr. Koehler.

17

The Undersigned concludes that substantial evidence does not support the ALJ's stated reasons for assigning "no weight" to Dr. Koehler's opinions.  Accordingly, the Undersigned **RECOMMENDS** that the Court **REMAND** this case to the Commissioner of Social Security for reconsideration.[4]

The ALJ must consider all medical opinions that he or she receives in evaluating a claimant's case.  20 C.F.R. § 416.927(c).  The applicable regulations define medical opinions as "statements from physicians . . . that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."  20 C.F.R. § 416.927(a)(2).

The ALJ generally gives deference to the opinions of a treating source "since these are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a patient's] medical impairment(s) and may bring a unique prospective to the medical evidence that cannot be obtained from the objective medical filings alone . . . ."  20 C.F.R. § 416.927(c)(2);  *Blakley*, 581 F.3d at 408.  If the treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the claimant's] case record, [the ALJ] will give it controlling weight."  20 C.F.R. § 404.1527(c)(2).

If the ALJ does not afford controlling weight to a treating physician's opinion, the ALJ must meet certain procedural requirements.  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544

---

[4]Because the ALJ's decision to afford "no weight" to Plaintiff's treating physician's opinions is not supported by substantial evidence and the case must be remanded for further fact finding, the Undersigned will not specifically address Plaintiff's remaining contentions of error. The Undersigned notes, however, that Plaintiff's concern that the ALJ improperly characterized the record to portray her condition more favorably than the medical evidence suggests appears to be substantiated.

(6th Cir. 2004).  Specifically, if an ALJ does not give a treating source's opinion controlling weight:

> [A]n ALJ must apply certain factors—namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source—in determining what weight to give the opinion.

*Id*.  Furthermore, an ALJ must "always give good reasons in [the ALJ's] notice of determination or decision for the weight [the ALJ] give[s] your treating source's opinion."  20 C.F.R. § 416.927(c)(2).  Accordingly, the ALJ's reasoning "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."  *Friend v. Comm'r of Soc. Sec.*, No. 09-3889, 2010 WL 1725066, at *7 (6th Cir. Apr. 28, 2010) (internal quotation omitted).  The United States Court of Appeals for the Sixth Circuit has stressed the importance of the good-reason requirement:

> "The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases," particularly in situations where a claimant knows that his physician has deemed him disabled and therefore "might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied."  *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir.1999). The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule. *See Halloran v. Barnhart*, 362 F.3d 28, 32–33 (2d Cir. 2004).

*Wilson*, 378 F.3d at 544–45.  Thus, the reason-giving requirement is "particularly important when the treating physician has diagnosed the claimant as disabled."  *Germany-Johnson v. Comm'r of Soc. Sec.*, 312 F. A'ppx 771, 777 (6th Cir. 2008) (citing *Rogers*, 486 F.3d at 242).

There is no requirement, however, that the ALJ "expressly" consider each of the *Wilson* factors within the written decision.  *See Tilley v. Comm'r of Soc. Sec.*, No. 09-6081, 2010 WL 3521928, at *6 (6th Cir. Aug. 31, 2010) (indicating that, under *Blakley* and the good reason rule,

an ALJ is not required to explicitly address all of the six factors within 20 C.F.R. §

404.1527(c)(2) for weighing medical opinion evidence within the written decision).

Here, the ALJ acknowledged that Dr. Koehler, Plaintiff's primary-care physician, is a

treating physician.  He then considered Dr. Koehler's opinion, but rejected it and assigned it "no

weight."  The ALJ explained as follows:

> The mental limitations and opinions assessed by the [Plaintiff's] primary care
> physician are entitled to no weight.  (Exhibits 5F and 9F/2).  The [Plaintiff's]
> primary care physician opined in March 2012 that the [Plaintiff] is unable to work
> (Exhibit 9F/2).  However, the primary care physician's opinions are inappropriate
> and unacceptable under the Regulations, as 20 CFR 404.1527(e) states that the
> final responsibility for determining if a [Plaintiff] is "disabled" or "unable to
> work" is reserved for the Commissioner. . . .
>
> *  *  *
>
> The primary care physician's opinions regarding the [Plaintiff's] mental
> limitations and employability (Exhibits 5F and 9F/2), are therefore entitled to no
> weight.  There is no evidence that the [Plaintiff's] primary care physician is also a
> psychologist, psychiatrist or mental health specialist.   The primary care
> physician's opinions regarding the [Plaintiff's] mental limitations are therefore
> entitled to no particular deference under the Regulations.  The evidence reflecting
> that the primary care physician referred the [Plaintiff] for psychological
> counseling (Exhibit 9F/10), further reflects the primary care physician's lack of
> expertise with regard to mental impairments and symptoms.   The primary care
> physician's opinions are inconsistent with the concurrent examination results,
> which reflect that the [Plaintiff's] mental impairments and symptoms were
> improved with prescribed treatment (Exhibits 1F/5, 23 and 27 and 9F/9 and 73).
> The primary care physician's opinions are inconsistent with the totality of the
> evidence, including the "paragraph B" criteria, as discussed above, which reflects
> no more than moderate limitation of adaptive, occupational and social
> functioning, and could support determinations as to no or only mild limitation of
> adaptive, occupational and social functioning.  Accordingly, the opinions of the
> [Plaintiff's] primary care physician regarding the claimant's mental limitations
> and employability are entitled to no weight in this case.

(R. at 28-29.)

The Undersigned finds that the ALJ stated, in the abstract, "good reasons" for rejecting

Dr. Koehler's opinions as controlling.  Specifically, the ALJ found that Dr. Koehler's opinions were inconsistent with his own treatment notes demonstrating Plaintiff has improved and inconsistent with the record as a whole.  *See* 20 C.F.R. § 404.1527(c)(4) (identifying consistency with the record as a whole as a relevant consideration in deciding the weight to give a medical opinion).  The ALJ also found that Dr. Koehler opined on an issue reserved to the Commissioner and that Dr. Koehler is not a mental health specialist.  *See Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007) (holding that the ALJ properly rejected a treating physician's opinion that the claimant was disabled because such a determination was reserved to the Commissioner); 20 C.F.R. § 404.1527(c)(5) (identifying "specialization" as a consideration in determining that weight to assign to a treating source's opinion).

The Undersigned concludes, however, that substantial evidence does not support the ALJ's stated reasons for assigning "no weight" to Dr. Koehler's opinion.  As a preliminary matter, the Undersigned notes that to the extent Dr. Koehler opined that Plaintiff was "totally disabled," (R. at 372), the ALJ properly rejected his opinions because such determinations are reserved to the Commissioner.  *Bass*, 499 F.3d at 511.  Nevertheless, Dr. Koehler also submitted a "Mental Impairment Questionnaire" in which he opined on Plaintiff's specific mental abilities and limitations.  (R. at 340-45.)  Thus, the ALJ could not completely reject Dr. Koehler's opinions on the basis that he made a determination on an issue reserved to the Commissioner.  Accordingly, substantial evidence must support the ALJ's other reasons for assigning no weight to Dr. Koehler's findings related to Plaintiff's mental abilities and limitations.

The Undersigned concludes that the ALJ's finding that Dr. Koehler's opinions are inconsistent with his own treatment notes is not supported by substantial evidence.  Dr.

Koehler's treatment notes indicate that he was treating Plaintiff for anxiety, panic attacks, and depression since at least April 8, 2003. (R. at 445.)  His notes indicate that she suffered from panic attacks, crying spells, anxiety, heart racing, and fatigue.  *Id.*  After Plaintiff's alleged disability onset date, Dr. Koehler's treatment notes indicate that he consistently treated her for panic attacks, depression, social phobia, and/or anxiety.  (R. at 282, 283, 285, 376, 377, 379, 384, 388, 389, 391, 393, 394, 397.)  The ALJ points to four treatment notes to support his conclusion that Dr. Koehler's opinions are inconsistent with examination results that demonstrate that Plaintiff's impairments and symptoms were improved.  One note, from September 13, 2010, indicates that her "Depression is better" (R. at 282).  Another note, from February 20, 2012, states that her anxiety/social phobia is "still [not] [controlled][5] but better." (R. at 379.)  Other than these two notes, the ALJ cites to treatment notes from before the alleged onset date of Plaintiff's disability to demonstrate that she had improved. (R. at 300, 304, 443.)  Treatment notes from before the alleged onset date cannot demonstrate that Plaintiff had improved.

Moreover, Dr. Koehler's notes indicate that despite the above cited treatment notes, Plaintiff continued to suffer from anxiety, panic attacks, and depression and that he continued to prescribe and adjust her medication.  On February 20, 2012, for example, Dr. Koehler suggested more aggressive psychological treatment.  (R. at 380.)  Additionally, on February 27, 2012, he noted that Plaintiff "does not currently leave house," does not shop, is afraid to answer the door, and does not interact socially except with her sister.  (R. at 377.)  He noted that she leaves her house only about two to three times per month.  *Id.*  Further, Dr. Koehler submitted his medical opinions explaining Plaintiff's continuing signs and symptoms on March 1, 2012 and June 6,

---

[5]The Undersigned notes that Dr. Koehler's handwriting is difficult to decipher.  From the best the Undersigned can tell, the note the ALJ points to reads "still not controlled but better."

2012.  (R. at 372, 340-45.)  Under these circumstances, the Undersigned concludes that the ALJ's finding that Dr. Koehler's opinions are inconsistent with his treatment notes, which demonstrate that Plaintiff's condition had improved, is not supported by substantial evidence. *See Bushor v. Comm'r of Soc. Sec.,* No. 1:09-CV-320, 2010 WL 2262337, at *10 (S.D. Ohio Apr. 15, 2010) *report and recommendation adopted*, No. 1:09-CV-320, 2010 WL 2246304 (S.D. Ohio June 4, 2010) (finding that "[t]he ALJ's limited citations to the mental health records do not fairly portray plaintiff's mental health functioning for the relevant time period and cannot constitute substantial evidence to support his decision.")

The Undersigned also concludes that the ALJ's finding that Dr. Koehler's opinion is inconsistent with the totality of the evidence is not supported by the record.  First, the fact that the non-examining and consulting doctors' opinions differ from Dr. Koehler's opinion is not a sufficient reason to reject the treating source's opinions.  On this point, the Court of Appeals for the Sixth Circuit has explained as follows:

> Surely the conflicting substantial evidence must consist of more than the medical opinions of the nontreating and nonexamining doctors.  Otherwise the treating-physician rule would have no practical force because the treating source's opinion would have controlling weight only when the other sources agreed with that opinion.  Such a rule would turn on its head the regulation's presumption of giving greater weight to treating sources because the weight of such sources would hinge on their consistency with nontreating, nonexamining sources.

*Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 377 (6th Cir. 2013).  Thus, in order to demonstrate that Dr. Koehler's opinions are inconsistent with the totality of the evidence, the ALJ must point to more than just the differing opinions of the State agency and consulting psychologists.

The ALJ also indicates, by pointing to his discussion regarding paragraph "B" criteria,

that he found Dr. Koehler's opinions to be inconsistent with the evidence regarding Plaintiff's activities of daily living, social functioning, and concentration, persistence, or pace.  (R. at 29.) In *Gayheart*, a case with facts similar to those at issue in this matter, the Sixth Circuit explained that the relevant inquiry is not whether a Plaintiff has done or can do certain activities, but rather, whether the plaintiff can do the activities on a sustained basis.  *Id.* As the Sixth Circuit explained in *Gayheart*:

> The ALJ does not contend, and the record does not suggest, that Gayheart could do any of these activities on *a sustained basis*, which is how the functional limitations of mental impairments are to be assessed.  *See* 20 C.F.R. § 404.1520a(c)(2); 20 C.F.R. Part 404, Subpart P, Appendix 1, at 12.00 ("Social functioning refers to your capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals.").  Gayheart's ability to visit his aunt and uncle, who live on his street, and to receive occasional visits from his neighbor does not undermine [his treating source's] opinion that Gayheart's ability to interact independently and appropriately with others on a sustained basis is markedly limited.  The same is true of his ability to accompany his wife on grocery-shopping trips once per month.  These activities would be relevant if they suggest that Gayheart could do something on a sustained basis that is inconsistent with his [treating source's] opinions.  But they do not.

> Furthermore, many of these examples are either taken out of context or are offset by other examples in the record.  Although it is accurate to say that Gayheart can drive, for instance, the record also shows that driving triggers his anxiety and that he thus relies on his wife to do most of the driving. . . . Nothing in the record suggests that he has left the house independently and on a sustained basis. . . . We therefore conclude that the ALJ's focus on isolated pieces of the record is an insufficient basis for giving [Plaintiff's treating source's] opinions little weight under 20 C.F.R. § 404.1527(c)

> Here, for example, in discussing Plaintiff's activities of daily living, the ALJ stated as

follows:

> The claimant occasionally visits her sister and parents.  The [Plaintiff] has a friend, with whom she sometimes socializes.  The [Plaintiff] has a valid drivers' license, occasionally drives, goes outside multiple times a week, and can go outside alone.  The [Plaintiff] also received rides from her husband to places she needs to go.  The evidence reflects that the [Plaintiff] shops in stores at least every three weeks. . . . The evidence reflects that the [Plaintiff] wanted to work on one

24

occasion, and the evidence reflects that she turned down a job offer in 2009.

(R. at 20) (internal citations omitted).

Similarly to *Gayheart*, substantial evidence does not support a finding that Plaintiff can do any of these activities on a sustained basis.  In addition, as in *Gayheart*, many of the ALJ's examples are either taken out of context or offset by other examples in the record.  For example, the ALJ did not note that Plaintiff only drives short distances because of her anxiety (R. at 336), that she reported needing emotional assistance from her husband to shop, make purchases, and manage money, *id.*, that she reported having to leave groceries at the counter at the store due to anxiety (R. at 90), or that she reported that she turned down the job in 2009 because she started having panic attacks when she was supposed to go in for orientation (R. at 81).  Further, Plaintiff continuously reported that she was afraid to go outside or commitments and that she only socialized with her sister, parents, and one friend.  In 2010, she stated that she went to Church two-three times per month (but only if her husband attends because she feels safer with him). (R. at 207.)  In 2012, she stated that she no longer attends Church due to her anxiety.  (R. at 95.) Thus, while the record demonstrates that Plaintiff can occasionally socialize with familiar individuals or leave the house to shop or go to Church, it does not demonstrate that she can do any of these activities on a sustained basis.  Accordingly, substantial evidence does not support the ALJ's conclusion that these activities are inconsistent with the social and daily living restrictions noted in Dr. Koehler's opinions.  *Gayheart*, 710 F.3d at 377.

Finally, while specialization is a relevant consideration in determining the weight to assess to a treating source's opinion, "[a] treating physician's opinion on the mental state of his patient constitutes competent medical evidence even though the physician is not a certified

psychiatrist." *See Bushor*, 2010 WL 2262337, at *10, n.4.  Further, specialization is only one of the relevant factors to consider in weighing medical evidence.  Other factors include the length of the treatment relationship, the frequency of examination, and the nature and extent of the treatment relationship.  *See Wilson* , 378 F.3d at 544.  In this case, Dr. Koehler had treated Plaintiff for nearly ten years and on a basis of every one-three months (at the time of his evaluation).  (R. at 340.)   The ALJ does not appear to have considered these factors.

Under these circumstances, substantial evidence does not support the ALJ's stated reasons for providing "no weight" to Dr. Koehler's opinion.  On remand, a proper analysis of the record might not support giving controlling weight to the opinions of Dr. Koehler.  Even if Dr. Koehler's opinions are not entitled to controlling weight, they must still be weighed in accordance with the prescribed regulations.  *Gayheart*, 710 F.3d at 380.  Accordingly, the Undersigned **RECOMMENDS** that this case be **REMANDED** to the Commissioner and the ALJ for the ALJ's failure to provide "good reasons" supported by substantial evidence for assigning no weight to Dr. Koehler's opinions.[6]

---

[6]The Undersigned notes that the ALJ treated Mr. Campbell as a treating psychologist, but Mr. Campbell is actually a licensed social worker.  Social workers are medical sources, but are not "accepted medical sources" under the regulations.  *See* 20 C.F.R. § 404.1513(a), (d).  Thus, social workers are not considered "treating sources" and their opinions are not entitled to deference under the treating source rule.  *See Varney v. Colvin*, No. 13-cv-53, 2014 WL 1877543, at *8 (E.D. Ky. May 9, 2014) (citing SSR 06–03p, 2006 WL 2329939, at *2–3 (Aug. 9, 2006) ("[O]nly 'acceptable medical sources' can be considered treating sources . . . whose medical opinions may be entitled to controlling weight . . . . [Opinions from] medical sources who are not 'acceptable medical sources,' such as . . . licensed clinical social workers . . . are important and should be evaluated on key issues such as impairment severity and functional effects.")).

## VIII.  CONCLUSION

Accordingly, it is **RECOMMENDED** that the Court **REVERSE** the Commissioner of Social Security's nondisability finding and **REMAND** this case to the Commissioner and the ALJ under Sentence Four of § 405(g) for further consideration of Dr. Koehler's opinions.

## IX.    PROCEDURE ON OBJECTIONS

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court. *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation). Even when timely objections are filed, appellate review of issues not raised in those objections is waived. *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).

27

Date: February 23, 2015
             /s/ *Elizabeth A. Preston Deavers*
             Elizabeth A. Preston Deavers
             United States Magistrate Judge